**E-FILED**
Thursday, 16 September, 2010  09:19:40 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

---

| | |
|---|---|
| **DENNIS NOONAN and**<br>**LANA NOONAN** )<br> )<br> )<br> **Plaintiffs,** )<br> )<br> **v.** )<br> )<br> **THOMAS HARRINGTON,** )<br> )<br> )<br> **Defendant.** ) | **Case No. 09-CV-03191** |

## OPINION

This case is before the court for ruling on a Motion for Summary Judgment (#73) filed by the defendant, Thomas Harrington. This court has carefully considered the arguments of the parties and the documents presented by the parties. Following this careful and thorough consideration, the defendant's Amended Motion for Summary Judgment (#73) is GRANTED.

## BACKGROUND

On November 18, 2008, plaintiffs Dennis and Lana Noonan filed a complaint against defendant Thomas Harrington. Although the original complaint had two counts, I and II, plaintiffs voluntarily dismissed Count II (#16) and replaced it with Count III (#50). In his Amended Motion for Summary Judgment (#65), the defendant acknowledges certain material facts previously alleged by the plaintiff, and declines to concede others.

A. Undisputed facts

Plaintiffs were minority shareholders in a corporation, Worden Martin, Inc, ("the Corporation") as well as owners of a parcel of real estate upon which the Corporation conducted

business. A Shareholders' Agreement was executed in 2001 that conditionally limited the percentage of retained earnings that could be maintained by the Corporation. Before December 2004, the Corporation distributed 85-90% of its earnings to shareholders. On December 1, 2004, the majority shareholders closed on a sale of their stock to George Shapland, with the purchase running through January 1, 2008. At that time, Plaintiffs did not sell their shares. On May 22, 2006, the defendant prepared a Memo interpreting those paragraphs in the Shareholders' Agreement that controlled the retention of earnings. The Memo stated, in essence, that after the stock purchase was complete, the Corporation was required only to withhold a minimum of 10% of earnings annually and distribute $50,000 as a draw against the monthly earnings for a total of $600,000. On November 13, 2007, the Board of Directors passed a resolution designating 61.5% of earnings as retained earnings. After consulting with counsel, Plaintiffs declined to proceed with a lawsuit challenging Defendant's interpretation of the Shareholders' Agreement. In May 2008, Plaintiffs subsequently sold to George Shapland (1) their shares in the Corporation for $2,334,812.00, and (2) their interest in the real estate for $1,517,000. (Plaintiffs' Response to Defendant's Motion for Summary Judgment, #74, p.2).

B. Contested allegations

Plaintiffs allege that Defendant was engaged as their attorney contemporaneous with his issuing the Memo to the Board of Directors. Plaintiffs further allege that as early as the initial sales negotiation beginning in 2003, the defendant had developed a conflict of interest between the plaintiffs and the stock purchaser, Shapland, as it was in Plaintiffs' interest that the Corporation continue to distribute 85-90% of earnings to shareholders, while it was in Shapland's interest to increase the percentage of shared earnings so as to have more control over cash flow. Therefore, Plaintiffs allege that Defendant's opinion letter enabled the Board of Directors to reduce

substantially the earnings distributed by the corporation, thereby becoming the proximate cause of Plaintiffs' reduction in receipt of dividends. Additionally, Plaintiffs further allege that Defendant not only failed to disclose to them the substance of the Memo, but also that but for Defendant's failure to disclose or withdraw representation, they would have accepted the stock purchaser's original offer of $3,125,000 in 2003.

Plaintiffs' expert witness, Dennis Knobloch, testified that Plaintiffs suffered a total economic loss of $2,305,000.00 as a result of being "forced to sell real estate prematurely depriving them of future lease payments and a decrease in the amount of corporate distributions resulting from a change in percentage of earnings being retained by the corporation." (Plaintiffs' Expert Witness's Opinion Letter, #65 ex. 1, p.19; headings omitted). This sum was calculated by adding the present value of future payments for the real estate lease ($1,161,000) to the present value of the expected future cash flow in perpetuity of the dividends based on an 85-90% expected distribution rate ($2,189,000), and subtracting the present value of the expected future cash flow in perpetuity of the dividends based on a 35% expected distribution rate ($1,045,000). (Plaintiffs' Expert Witness's Opinion Letter, #65 ex. 1, p. 18 and Schedules B and C). Thus, Plaintiffs' alleged damages have all been reduced to present cash value equivalent.

Defendant's expert witness, Neil Gerber, testified that plaintiffs suffered no economic loss from selling their stock and real estate. On the issue of the stock, he testified that the model's estimated present value of the expected future cash flow of the dividends based on an 89% historical distribution rate would be $2,030,000. However, because the future cash flow was in fact converted to present value through sale of the stock, he subtracted the actual sales price of the stock sold, $2,334,812, to conclude that plaintiffs suffered no economic loss from the sale of the stock. On the

issue of the real estate lease, Gerber testified that the model's estimated present value of the future

lease payments plus residual was $1,480,000. Again, however, because Plaintiffs realized actual

proceeds of $1,517,000 on the sale of the property, Defendant's expert witness opined that they

suffered no economic loss. Finally, on the issue of loss in value from a premature sale of the stock,

Gerber testified that, taking into consideration actual dividends received as well as projected

investment earnings, Plaintiffs suffered no economic loss comparing their failure to sell the stock

in May 2004 and their actual sale in April 2008. (Defendant's Expert Witness's Opinion Letter, #65

ex. 2, pp. 31-32, Table 1).

## ANALYSIS

### I. SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986); Trentadue v. Redmon, --- F.3d ----, 2010 WL 3239397, at *3

(7th Cir. 2010). In ruling on a motion for summary judgment, a district court has one task and one

task only: to decide, based upon the evidence of record, whether there is any material dispute of fact

that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making

this determination, the court must construe the evidence in the light most favorable to the

nonmoving party and draw all reasonable inferences in favor of that party. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp.

2d 917, 929 (C.D. Ill. 2002). However, the mere existence of a scintilla of evidence in support of

the nonmoving party will be insufficient; there must be evidence on which the jury could reasonably

find for the nonmoving party. Liberty Lobby, Inc., 477 U.S. at 252.

Once the moving party has shown that the facts entitle them to judgment in their favor, the burden shifts to the nonmoving party to identify some evidence in the record that establishes a triable factual issue. Trentadue, 2010 WL 3239397, at \*3, citing Dugan v. Smerwick Sewerage Co., 142 F.3d 398, 402 (7th Cir. 1998). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23.

## II. MERITS OF PLAINTIFFS' CLAIM

In an action for legal malpractice the plaintiff must plead and prove that (1) the defendant attorney owed the plaintiff (his former client) a duty of due care arising from the attorney-client relationship; (2) that the defendant breached that duty; and that (3) as a proximate result, (4) the plaintiff suffered injury. Tri-G, Inc. v. Burke, Bosselman & Weaver, 856 N.E.2d 389, 394 (Ill. 2006); Fitch v. McDermott, Will and Emery, LLP, 929 N.E.2d 1167, 1183 (Ill. App. 2010). The existence of actual damages is essential to a viable cause of action for legal malpractice. Tri-G, Inc. 856 N.E.2d at 395. In the instant Motion for Summary Judgment, Defendants argue that notwithstanding the veracity or validity of the first three elements, Plaintiffs suffered no economic damages and therefore the action for legal malpractice may not be sustained. Amended Motion for Summary Judgment, p.1 (#73). Because Plaintiffs admit that they did in fact sell both their stock and real estate assets to a third party for value, this motion turns on whether the consideration that Plaintiffs received may be considered in determining damages. Plaintiffs' Response to Defendant's Motion for Summary Judgement, p.2 (#74). Plaintiffs make two arguments why the amount they

received should not be included in the calculation of damages. First, they argue that the collateral

source doctrine prohibits subtracting any amount received from a third party. Second, they argue that

because Federal Rule of Evidence 408 bars the admission of any evidence pertaining to a negotiated

compromise of a disputed claim, the amount of money that Plaintiffs received in exchange for their

assets is not admissible. Plaintiffs' Response to Defendant's Motion for Summary Judgement, pp.2-3

(#74).

A. Applicability of the collateral source doctrine to profits from the sale of assets

Plaintiffs claim that they were subjected to a reduced future income stream from the lowered

dividend distributions, as well as from the loss of real estate lease receipts, and suffered damages

accordingly. Defendant concedes that the Board of Director's decision to increase retained earnings

caused Plaintiffs to be subjected to a reduced future income stream and persuaded them to sell their

real estate, thereby forgoing a future income stream from leasing the land. However, he argues that

because the entire value of the total future income stream of both assets were exchanged for their

present cash value via sale, Plaintiffs suffered no economic loss and therefore no actual damages.

Amended Motion for Summary Judgment, p. 5 (#73). In essence, Defendant argues that the

economic value of the assets as investments held in perpetuity were simply transformed into a single

lump-sum payment, pursuant to generally accepted accounting practices. In response, Plaintiffs

admit that while they did in fact receive the present cash value of the future income stream, evidence

of their receipt of that cash from the sale should be barred by the collateral source rule.

Therefore, the following analysis has four steps. First, do increased retained earnings

necessarily cause shareholders in a closely-held corporation to lose value and suffer injury? Second,

if they do, does Illinois follow the collateral source rule? Third, if it does, is legal malpractice in

Illinois subject to the collateral source rule? And finally, if it is, does the collateral source rule cover proceeds from a sale in an arm's-length contract transaction?

1. Increased retained earnings as loss of value

A preliminary issue is whether Plaintiffs suffered injury when the Board of Directors voted to increase retained earnings. Generally, a corporation's decision to increase retained earnings at the expense of dividend distributions does not necessarily result in a loss of value to shareholders. Economists have stated that in a public firm,

> cash flows will be converted into either dividends or retained earnings. Either increased dividends or increased retained earnings will raise the value of the firm, lifting its stock price and resulting in capital gains for its shareholders . . . . In [public and closely held firms], . . . it is the cash flow, not profit, that determine value. . . . *Only retained cash can be used to undertake additional investments that are necessary to implement growth opportunities.*

Michael S. Long & Thomas Alex Bryant, Valuing the Closely Held Firm 73 (emphasis added). Earnings may be reinvested in preparation for expansion, which, while a short-term loss in dividend distribution, could lead to a long-term increase in profitability.

Under Illinois law, the board of directors of a corporation may authorize, and the corporation may make, distributions to its shareholders, subject to, among other things, restrictions in the articles of incorporation. 805 Ill. Comp. Stat. 5/9.10 (2010). The choice to maintain a large cash surplus involves "questions of business judgment to be determined by the directors of the corporation in their discretion, which will not be controlled by the court so long as it is exercised in good faith and

in honesty of purpose." Hall v. Woods, 325 Ill. 114, 140 (Ill.1927). See also Romanik v. Lurie Home Supply Center, Inc., 435 N.E.2d 712 (Ill. App. Ct. 1982) ("The decision concerning the declaration of a dividend where a legal dividend fund is available rests within the sole discretion of the board of directors. Courts are reluctant to interfere with the exercise of the directors' business judgment unless the withholding is fraudulent, oppressive or totally without merit."); Gehrt v. Collins Plow Co. 156 Ill.App. 98 (Ill. App. Ct. 1910) ("In determining the disposition to be made of the gains of a business, the directors . . . may reserve of them whatever their judgment approves as necessary or judicious for repairs and improvements, and to meet contingencies, both present and prospective, and may also in the exercise of a sound discretion, increase the assets of a company beyond their nominal amount by retaining and accumulating profits or earnings and applying them to the purchase of property or other purposes not beyond the corporate powers.") (citations omitted).

However, valuation for a large public firm may be different from that of closely-held corporation, as is the situation here. Count III, ¶ 8 (#50) ("The corporation was a Subchapter S Corporation . . . .") Unlike a publicly traded corporation, where the undistributed surplus would theoretically be reflected in the increase in the value of the stock, there is no ready market for the stock of a closely-held corporation,. See, e.g., Raynolds v. Diamond Mills Paper Co., 60 A. 941 (N.J. Ch. 1905) (requiring the board of directors of a closely-held corporation to make an accounting when they retained earnings and voted themselves salary raises at the expense of distributing dividends over a number of years because the shares of a closely-held corporation have no market value). Potential injury would result from a lack of competition, enabling the purchaser of the stock to "force" a shareholder to sell below actual value. Arguably, the dominant value of shares in a closely-held corporation are from dividend distributions. Without ruling on whether increasing

8

retained earnings at the expense of dividend distributions are or are not a loss to shareholders in a closely-held corporation, this analysis proceeds by assuming that it is a loss, so as to address the arguments raised by the parties.

2. Collateral source rule in Illinois

Historically, Illinois law has had two different approaches to what a plaintiff who has been injured by a tortfeasor may recover: (1) only those net expenditures actually made or obligations incurred; or (2) the entire reasonable value of services required by the injury, regardless of whether he has already been compensated by a third party. Wills v. Foster, 892 N.E.2d 1018, 1023-1025 (Ill. 2008).[1] In Peterson, the plaintiff sued the seller of an allegedly defective automobile, which had struck and seriously injured his son. The court reasoned that "[a]warding [the plaintiff] the monetary value of the services in a judgment . . . seems an unanticipated windfall" and held that because the medical services provided to his child were obtained from a third party without expense, obligation, or liability, the plaintiff was not allowed to recover their reasonable value from the defendant. Peterson v. Lou Bachrodt Chevrolet Co., 392 N.E.2d 1, 5 (Ill. 1979). In evaluating Peterson, the Wills court noted that this approach has been criticized for focusing on the nature of the compensation to the tort victim, rather than the relationship between the tort victim and the

---

[1]To be more precise, the court recognized that the collateral source rule has two components: first, as a rule of evidence, barring the jury from learning about collateral income; and second, as a rule of damages, barring the defendant from reducing the plaintiff's compensatory award by the amount the plaintiff received from the collateral source. Wills v. Foster, 892 N.E.2d 1018, 1022-1023 (Ill. 2008). While the cases discussed in Wills go to the evidentiary rule, the court held broadly on the issue of "recovery" and adopted the rule in Restatement (Second) of Torts § 920A, which addresses payments being "credited" against the tortfeasor's liability, see infra. Therefore, the analysis in the instant case is pertinent to Plaintiffs' argument that the collateral source rule bars reducing their award by the amount received from their sale of the assets.

tortfeasor. <u>Wills</u>, 892 N.E.2d at 1026. Such a view "results in a diminution of the tortfeasor's liability *vis-a-vis* an insured victim when compared with the same tortfeasor's liability *vis-a-vis* an uninsured victim." <u>Id.</u>, citing <u>Bozeman v. State</u>, 879 So.2d 692, 703 (La. 2004). This actual-benefit approach views tort law as being compensatory, rather than punitive. As long as the tort victim's injuries are adequately compensated, regardless of the source of compensation, the tortfeasor is no longer liable for those injuries.

In <u>Arthur</u>, the plaintiff was attending an auction when she stepped in a hole and fractured her leg just below the knee. <u>Arthur v. Catour</u>, 833 N.E.2d 847, 849 (Ill. 2005). Although she claimed damages including medical expenses valued at $19,314.07, her medical insurance providers actually paid $13,577.97 in complete satisfaction of services already rendered, due to a variety of discounts. <u>Id.</u> at 850. The court held that evidence of the billed amount was admissible for the purpose of establishing the reasonable value of the services, noting, however, that defendants were free to challenge plaintiff's proof on cross-examination and to offer their own evidence pertaining to the reasonableness of the charges. <u>Id</u>. at 854.

In 2008, the Illinois Supreme Court acknowledged a conflict between <u>Arthur</u> and <u>Peterson</u> and reconciled them by expressly overruling <u>Peterson</u> and derogating its exclusive focus on the compensatory nature of tort damages. <u>Wills</u>, 892 N.E.2d at 1031. In adopting the reasonable-value approach from <u>Arthur</u>, it was persuaded by, among other things, the rationale offered by the Restatement of Torts, which requires that

> [p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.

Restatement (Second) of Torts § 920A(2) (1979).

In contrast to the compensatory approach taken by the <u>Peterson</u> court, the modern view of tort damages takes the stance that "it is the tortfeasor's responsibility to compensate for all harm that *he causes*, not confined to the net loss that the injured party receives." Restatement (Second) of Torts § 920A cmt. b (1979) (emphasis added). Because the Restatement's view is that "a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor", its approach has "an element of punishment of the wrongdoer involved." <u>Id</u>. Therefore, this court recognizes that in adopting the reasonable-value approach in <u>Arthur</u> and the Restatement, and by overruling the actual-benefit approach in <u>Peterson</u>, Illinois has shifted from a compensatory model to a punitive model for general tort law. Having stated so, however, this court must now address the issue of whether legal malpractice follows the rule for torts in general.

3. Applicability of collateral source doctrine to legal malpractice

After a thorough examination of Illinois case law, this court concludes that the collateral source doctrine does not apply to legal malpractice torts in Illinois. In <u>Sterling</u>, the plaintiffs had previously defaulted on a promissory note, was sued on the note, and was held to be liable. <u>Sterling Radio Stations, Inc. v. Weinstine</u>, 765 N.E.2d 56, 59 (Ill. App. Ct. 2002), <u>pet. for leave to appeal denied</u>, 775 N.E.2d 9 (Ill. 2002). A third party settled with the parties to whom the plaintiffs owed the judgment by paying value in full satisfaction of the claim. Then, the plaintiffs brought an action against their former law firm for legal malpractice. <u>Id.</u> The court held that the collateral source rule does not apply to legal malpractice. <u>Id.</u> at 61. Because the plaintiff "personally paid nothing in satisfaction of the judgment rendered against him . . . as a result of defendants' malpractice . . . his measure of damages is zero." <u>Id.</u> at 62.

This analysis notes that Wills was decided in 2008, while Sterling was decided in 2002.

Although no Illinois case could be found that explicitly overrules Sterling, the Illinois Supreme

Court's shift from an actual-benefit model to a reasonable-value model, as discussed supra, suggests

that it might also rule that legal malpractice should be subject to the collateral source rule. However,

the *ratio decidendi* of Sterling advises otherwise. The court reasoned that "[t]he injuries resulting

from legal malpractice are not personal injuries, but are pecuniary injuries to intangible property

interests." Sterling, 765 N.E.2d at 62. A legal malpractice action in Illinois is grounded in the policy

that "the plaintiff [should be] compensated for an injury caused by a third party, absent negligence

on the part of the plaintiff's attorney." Eastman v. Messner, 721 N.E.2d 1154, 1158 (Ill. 1999). "The

legal malpractice action places the plaintiff in the same position he or she would have occupied but

for the attorney's negligence. The operative words are 'in the same position.' The link exists to

ensure that the plaintiff is in no better position by bringing suit against the attorney than if the

underlying action against the third-party tortfeasor had been successfully prosecuted." Bloome v.

Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C., 664 N.E.2d 1125, 1131 (Ill. App. Ct.

1996). Accordingly, because the goal of the legal malpractice tort is exclusively compensatory in

nature, it is not subject to the reasoning that persuaded the Illinois Supreme Court to switch to a

punitive, reasonable-value model for the collateral source rule. Instead, a plaintiff who has received

full compensation for his injury, regardless of the source, is placed in the same position but for the

attorney's negligence, and thus must offset their damages by the amount received. However, due to

the lack of precedent from the Illinois Supreme Court, this court will proceed to also determine

whether a receipt from the sale of assets qualifies as a "collateral source benefit."

4. Profits from sale of assets as collateral source benefit

Plaintiffs cite to <u>Dereak</u> to support the proposition that the defendant cannot subtract a payment made by a third party from the alleged damages. Plaintiffs' Response to Defendant's Motion for Summary Judgment p. 16 (#74), <u>citing</u> <u>Dereak v. Mattox Trucking Co.</u>, 2008 WL 4911891 (C.D. Ill. 2008) (unpublished). In <u>Dereak</u>, the plaintiff was injured while on the job and was unable to work for about three months. <u>Id.</u> at *2. However, his employer continued to pay him an amount equal to his full salary, according to the terms of his benefit package. <u>Id.</u> The court held that because "an employer's payment of wages during incapacity cannot be counted to reduce the damages available to the injured party, . . . [p]laintiff[] can seek to recover the wages that [he] did not earn for the period that he was off work." <u>Id.</u> at *5. Plaintiffs argue that <u>Dereak</u> is on point. The court disagrees.

Employment benefits—or, for that matter "benefits" in general—are fundamentally different from value received from the sale of assets. The scope of the collateral source rule in the Restatement extends to the following types of benefits: Insurance policies, employment benefits, gratuities, and social legislation benefits. Restatement (Second) of Torts § 920A cmt. c (1979). Receipts from sale are not among that list. Notably, the comment neglects to include a non-exclusivity clause such as "among others" or "but is not limited to." It is clear that the drafters of the Restatement did not foresee a situation where a plaintiff sells their assets to a third party only to claim that the collateral source rule treats those receipts as a "benefit." They reasoned that "[i]f the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage it confers." Restatement (Second) of Torts § 920A cmt. c (1979). The receipt from a sale of assets is neither a gift nor benefit established by law, but a contract transaction

at arm's-length between two parties. Plaintiffs could and may very well have invested the proceeds from the sale to realize the same effective future income stream as that from the dividends.

B. Admissibility of sale prices under FRE 408

Plaintiffs argue that evidence relating to their sale of assets to a third party is inadmissible under Federal Rule of Evidence 408 because they "accepted a valuable consideration in compromising their claim." Here, the issue is whether FRE 408 bars admission, in a subsequent unrelated litigation, of the amount of proceeds from a contract transaction if there was a dispute between the transacting parties regarding an ancillary issue. This court holds that it does not.

Federal Rule of Evidence 408 states that evidence of accepting a valuable consideration in compromising a claim is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction. Fed. R. Evid. 408(a). Rule 408 forbids admission of evidence of an offer to compromise a claim for the purpose of asserting that the opposing party admitted the validity or invalidity of a claim or amount. Fed. R. Evid. 408(a), Advisory Committee Notes. The Advisory Committee noted that there were two rationales for the rule: first, that the evidence may be irrelevant, since the offer may be motivated by a desire for peace rather than any concession of weakness of position; and second, that such a rule promotes the public policy of favoring a compromise and settlement of disputes. Id.

Plaintiffs have proposed that this Rule is broad enough to cover evidence of the amount that Shapland, a third party, paid them for their stock and real estate, in an arm's-length contract transaction. Plaintiffs argue that because they had disputed whether the increase in retained earnings (and decreased dividend distributions) were in fact authorized by the shareholder agreement, there

was a "claim" and "dispute." They then argue that the failure to come to an agreement on the amount

of retained earnings led to negotiations regarding sale of the stock and real estate. When Plaintiffs

and Shapland arrived at a mutually agreeable compromise regarding the valuation of the stock and

real estate, the final value was, not surprisingly, at a "substantial reduction from the plaintiffs'

original offer and shows the compromise involved between the parties." Plaintiffs' Response to

Defendant's Motion for Summary Judgment p. 20 (#74). Therefore, Plaintiffs assert that "if Rule

408 applies, it renders inadmissible the amounts paid by Shapland to the Plaintiffs for their stock

and real estate." Plaintiffs' Response to Defendant's Motion for Summary Judgment p. 22 (#74).

This court disagrees.

First, Defendant's purpose in admitting the amount of the sale is to show that Plaintiffs did

in fact sell their assets for value, not to prove the liability, invalidity of, or amount of a claim.

Although this rationale is circular—that is to say, Plaintiffs have proposed Rule 408 as a method of

barring evidence that Plaintiffs sold their assets; Defendant's purpose in admitting the sale is to

present evidence that Plaintiffs sold their assets—this circularity highlights the incongruity of

Plaintiffs' suggestion that Rule 408 could be used to bar factual evidence that a sale occurred.

Second, the disputes during the sale negotiation were over the percentage of retained

earnings and the valuation of the stock and real estate assets. The claim in the instant case is whether

the defendant failed to disclose a conflict of interest and failed to withdraw from representation.

Plaintiffs do not contest the liability, invalidity, or amount of any claim in the current litigation.

Third, if it were true that the scope of Rule 408 were so broad as to block admission of the

amount of consideration paid in a contract transaction, this court would reach the absurd conclusion

that in a trial where any negotiation over the valuation of assets in question had occurred, even if

in an unrelated or ancillary issue, it would appear as though one of the parties had received the assets

for no consideration at all. Finally, neither of the goals of Rule 408 would be served by extending

its scope in the manner proposed by Plaintiffs.

Therefore, without ruling on whether increased earnings are necessarily a loss of value to

shareholders or whether legal malpractice is subject to the collateral source rule, this court holds that

the receipts received by plaintiffs may be subtracted from the alleged damages flowing from

Defendant's alleged negligence. Because Plaintiffs' (1) alleged damages of $2,189,000 in present

value of the future income from the dividends distributed from the shares are less than the receipts

of $2,334,812 from the sale of said shares, and (2) alleged damages of $1,161,000 in present value

of the future payments from the lease of the real estate are less than the receipts of $1,517,000 from

the sale of said real estate, this court finds that Plaintiffs have suffered no economic loss. Because

Plaintiffs have suffered no economic damage, they cannot survive a motion for summary judgment.

Accordingly, Harrington's Motion for Summary Judgment must be granted.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Amended Motion for Summary Judgment (#73) is GRANTED.

(2) This case is terminated.

ENTERED this 16th day of September, 2010.

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE